UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES,

Plaintiff,                                    Case No. 19-cr-20396

v.                                    UNITED STATES DISTRICT COURT
                                         JUDGE
KENNYON ROSHAWN JACKSON,             GERSHWIN A. DRAIN

Defendant.

_____/

## OPINION AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE [#13], FINDING THE ENDS OF JUSTICE WILL BE SERVED BY GRANTING A CONTINUANCE EXCLUDING CERTAIN DATES FROM THE SPEEDY TRIAL CLOCK AND AMENDING DATES

### I. INTRODUCTION

On June 11, 2019, a grand jury indicted Kennyon Roshawn Jackson ("Defendant") with Felon in Possession of a Firearm, 18 U.S.C. § 922(g). ECF No. 1. This charge stems from a traffic stop and arrest—in response to a parole violation warrant against Defendant—on April 25, 2019. ECF No. 13, PageID.32.

Presently before the Court is Defendant's Motion to Suppress Evidence, filed on August 30, 2019. ECF No. 13. The Government filed a Response on September 24, 2019. ECF No. 17. A hearing on Defendant's Motion was held on October 28, 2019. For the reasons that follow, the Court DENIES Defendant's Motion [#13].

1

## II. Factual Background

Defendant was released on parole by the Michigan Department of Corrections ("MDOC") on April 10, 2018 after serving a 4-10-year sentence for assault with intent to cause great bodily harm less than murder, as well as a 2-year sentence for felony firearm. ECF No. 17, PageID.55. His term of parole was scheduled to end on April 20, 2020. *Id.* On April 25, 2019, a parole violation warrant was entered into the Michigan Law Enforcement Information Network ("LEIN") for Defendant; he was allegedly involved in a domestic violence incident in Van Buren Township, Michigan on April 24, 2019. *Id.* MDOC's Absconder Recovery Unit ("ARU") was directed to locate and arrest Defendant on the warrant. *Id.*

On the evening of April 25, 2019, ARU Investigator Jon Hugle located an individual he believed to be Defendant. *Id.* at PageID.56. At approximately 7:54 p.m. that evening, Investigator Hugle requested assistance from a marked patrol unit to initiate a traffic stop. *Id.* He broadcasted a description of a gray Saturn with license plate number DYT0580, as well as a description of Defendant: "black male, 27 [years old], 5'8", about 180 [pounds], long dreads." *Id.*

A unit from the Ypsilanti Police Department initially spotted the Saturn, but eventually discontinued taking any action once they observed Defendant walking into a residence. ECF No. 17, PageID.56. Washtenaw County Sheriff's Deputies Michael Hogan and Roger Khattar, driving in separate cars, soon responded to the

dispatch stating that they were available to assist.  *Id.*  They parked opposite the Ypsilanti neighborhood where the Saturn was stopped at 1756 Tyler Road.  *Id.*  At the hearing, Deputy Hogan testified that he was there for "less than fifteen minutes." He further indicated that he did not pull up any information of the described parole absconder at this time.  At 8:13 p.m., Investigator Hugle broadcasted that the Saturn was on the move.  *Id.*  A female individual was observed driving the Saturn, while Defendant was reported to be the front passenger.  *Id.*

Deputies Hogan and Khattar caught up to and located the Saturn driving eastbound on 1-94 towards the Rawsonville Road exit.[1]  *Id.*  Deputy Hogan observed the Saturn had tinted windows and that the female driver failed to use a turn signal. ECF No. 13, PageID.39.  He then initiated a traffic stop at the exit ramp.  *Id.*

Deputy Hogan approached the driver, later identified as Ms. Janiqua Stines, while Deputy Khattar approached the passenger, later identified as Defendant.  ECF No. 17, PageID.57.  Both deputies held flashlights in their hands.  *Id.*  As they approached, Investigators Hugle and Barnett, who arrived shortly after the stop, remained behind the Saturn with their service weapons holstered.  *Id.* at PageID.58.

---

[1] At the hearing, Deputy Hogan explained that the Ypsilanti unit discontinued their investigation when the Saturn fell out of its jurisdiction; Deputies Hogan and Khattar immediately took over when the Saturn drove away from the Tyler residence.

After Ms. Stines gave Deputy Hogan her name and passport as identification[2], Deputy Hogan determined that her license was suspended. ECF No. 13, PageID.39. Deputy Hogan also asked Defendant for his identification; Defendant responded that he did not have a license and that his name was "Joseph Calhoun." ECF No. 17, PageID.58. At the hearing, Deputy Hogan indicated that it was "normal procedure" to ask passengers for their identification—especially if drivers are found driving without any identification, as was the case here with Ms. Stines—in order to determine whether it is possible to avoid impounding a vehicle and instead having the passenger drive the vehicle away at the conclusion of the stop.

Further, Deputy Hogan testified that he noticed a "bulge" under Defendant's sweatshirt hood at the time he first requested identification from both passengers, which he was able to eventually confirm was Defendant's long dreads as described over the dispatch. Deputy Hogan removed Ms. Stines from the Saturn once she indicated she did not have a valid license, placed her in handcuffs, and put her in the back of his patrol car. ECF No. 13, PageID.39. He informed Ms. Stines that he wasn't going to take her to jail for a suspended license. ECF No. 17, PageID.58.

After placing Ms. Stines in his patrol car, Deputy Hogan returned to the Saturn's open driver side door. He again asked Defendant for his name and date of

---

[2] Ms. Stines notified Deputy Hogan that her license was probably suspended because she missed a court date for an earlier ticket. Gov.'s Ex. A at 00:17:31.

birth. *Id.* Defendant responded, "Joseph Parnell Calhoun" with a birthdate of April 8, 1994. *Id.* While Deputy Hogan wrote this information down, he asked Defendant to pull his hood down. At the hearing, Deputy Hogan testified that once Defendant pulled his hood down, his suspicion grew that he was in fact the parole absconder.

Before returning to his patrol car, Deputy Hogan instructed Defendant, "Do me a favor. Turn the car off with the ignition. Take the keys out. Hand them to me." *Id.* at PageID.59. Defendant complied with this request; he remained in the Saturn and used his phone. *See* Gov.'s Ex. D at 00:08:06–00:08:21. Deputy Khattar, meanwhile, stood at the rear passenger window, with his weapon holstered, shining his flashlight on Defendant. *Id.* The two ARU investigators remained behind the Saturn. ECF No. 17, PageID.59; *see also* Gov.'s Ex. E at 00:02:34–00:07:01

After running the false name through the LEIN, Deputy Hogan approached and asked Investigator Hugle—who initially broadcasted Defendant's identity—if he could identify the Defendant. *Id.* Investigator Hugle positively responded that he would recognize Defendant if he saw him. ECF No. 13, PageID.40. At the hearing, Deputy Hogan provided further details of his exchange with Investigator Hugle before he returned to the Saturn. He explained that Investigator Hugle provided him with the same physical description of Defendant. Investigator Hugle also provided Deputy Hogan with information about Defendant's criminal history.

After this exchange, Deputy Hogan and ARU Investigators Hugle and Barnett returned to the Saturn. Deputy Hogan approached the driver's door, while Investigator Hugle approached the passenger side, standing next to Deputy Khattar. ECF No. 17, PageID.60. Once Investigator Hugle saw Defendant, he gave a "thumbs up" to Deputy Hogan. *Id.* Deputy Khattar then opened the passenger door, grabbed Defendant's right arm, and told him to step out of the Saturn. Investigators Hugle and Barnett assisted Deputy Khattar in pulling Defendant out. ECF No. 13, PageID.40. As the officers pulled Defendant out, Deputy Hogan observed a firearm in Defendant's waistband. He alerted the officers, "gun in his waistband!" three times. Gov.'s Ex. B at 00:22:01. The officers took Defendant to the ground and tased him several times. *Id.*

Deputy Khattar and Investigators Hugle and Barnett then removed a Hornady 9mm pistol from Defendant's waistband. *Id.* The officers subsequently patted Defendant down and strip searched him on the side of the road. ECF No. 13, PageID.40. Deputy Hogan was particularly concerned with finding the pistol's magazine. *See* Gov.'s Ex B at 00:08:10; 00:11:30; 00:15:40. Once Defendant was in custody, the officers searched the Saturn and found a 30 round Glock magazine, which matched the pistol, in the back seat. ECF No. 17, PageID.61.

Defendant now challenges the admissibility of the fruits of the alleged illegal arrest. *Id.* at PageID.41. He concedes that the officers had justification for the initial

traffic stop. However, Defendant submits that the officers then lacked probable cause or reasonable suspicion to extend the stop. *Id.* He therefore argues the firearm and ammunition should be suppressed. *Id.*

The Government claims that Defendant was briefly detained only for Deputy Hogan to complete the traffic stop. ECF No. 17, PageID.55. Furthermore, it purports that the officers had reasonable suspicion for the ensuing *Terry* stop and then probable cause to arrest Defendant upon Investigator Hugle's positive identification. *Id.* at PageID.64. The Government argues that the recovered firearm and ammunition should not be suppressed and thus Defendant's Motion should be denied. *Id.* at PageID.67.

At the hearing on the Motion, the Government called one witness, Deputy Hogan. There, the Government questioned Deputy Hogan on his experience as a Washtenaw County Sheriff's Deputy for four and a half years as well as the events on April 25, 2019, as explained above. The defense did not call any witnesses. Both parties argued from their briefs following their questioning of Deputy Hogan.

### III. LAW & ANALYSIS

The Fourth Amendment protects "[t]he right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures …." U.S. CONST. amend. IV. A search occurs "[w]hen the Government obtains information by physically intruding on persons." *Florida v. Jardines*, 569 U.S. 1, 5

(2013).  A search conducted without a warrant is "*per se* unreasonable," subject only to specifically established exceptions.  *Katz v. United States*, 389 U.S. 347, 357 (1967); *see also United States v. Jenkins*, 92 F.3d 430, 436 (6th Cir. 1996).  A seizure occurs when "under the totality of the circumstances, a reasonable person would have believed that he or she was not free to walk away.'"  *United States v. Alston*, 375 F.3d 408, 411 (6th Cir. 2004) (internal citation omitted).

There are three forms of police-citizen encounters: (1) consensual encounters, where contact is initiated by a police officer without any articulable reason and the citizen is briefly questioned; (2) a temporary involuntary detention or *Terry* stop, which must be predicated upon reasonable suspicion; and (3) arrests, which must be based on probable cause.  *United States v. Campbell*, 486 F.3d 949, 953–54 (6th Cir. 2007) (quoting *United States v. Bueno*, 21 F.3d 120, 123 (6th Cir. 1994)).

## A. Initial Traffic Stop

An ordinary traffic stop by the police is a "seizure" within the meaning of the Fourth Amendment.  *United States v. Blair*, 524 F.3d 740, 748 (6th Cir. 2008) (citing *Delaware v. Prouse*, 440 U.S. 648, 653 (1979)).  The police's detention of a vehicle's occupants also constitutes a "seizure."  *United States v. Hill*, 195 F.3d 258, 263–64 (6th Cir. 1999).  A seizure is legitimate if "probable cause of a civil infraction or reasonable suspicion of criminal activity" exists at the time of the stop.  *United States v. Lyons*, 687 F.3d 754, 763 (6th Cir. 2012) (internal citation omitted).

"When a traffic stop is supported by probable cause, an officer's subjective intent is irrelevant." *United States v. Blair*, 524 F.3d 740, 748 (6th Cir. 2008) (citing *Whren v. United States*, 517 U.S. 806, 813 (1996)). Officers can stop vehicles for any infraction, "no matter how slight[.]" *United States v. Mesa*, 62 F.3d 159, 162 (6th Cir. 1995); *see also Hill*, 195 F.3d at 265 (upholding stop supported by probable cause when the officer initially followed the vehicle because it was of a type used to transport narcotics).

This circuit has previously addressed the concern that police officers may use the Supreme Court's *Whren* principle—that an officer's subjective intent is irrelevant when the traffic stop is supported by probable cause—as "carte blanche permission to stop and search "target" or "profile" vehicles[.]" *Hill*, 195 F.3d at 267. In *Hill*, the Sixth Circuit emphasized how it is the "responsibility of the courts to [ensure] that police officers act appropriately and do not abuse the power legally afforded to them by, among other things, carefully scrutinizing a police officer's testimony as to the purpose of the initial traffic stop." *Id.*

The parties in the instant case do not contest the facts related to the purpose of the initial traffic stop. *See* ECF No. 13, PageID.33 ("[T]he officers had justification for the initial traffic [stop.]"); ECF No. 17, PageID.62. Deputy Hogan observed the Saturn had tinted windows and that the female driver failed to use a turn signal—constituting two separate civil infractions. ECF No. 13, PageID.39.

Thus, there was probable cause to make the initial stop, irrespective of the officers' subjective motivation for stopping the Saturn based on Investigator Hugle's call for Defendant's alleged parole violation.

## B. Detention After Initial Stop

This finding, however, does not end the relevant inquiry. A seizure that is lawful at its inception "can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005). This Court must therefore determine whether the officers' execution of the stop complied with the standard for temporary detentions set forth in *Terry*. *See United States v. Everett*, 601 F.3d 484, 488 (6th Cir. 2010); *United States v. Hill*, 195 F.3d 258, 264 (6th Cir. 1999) (stating that "the principles announced in *Terry v. Ohio* apply to define the scope of reasonable police conduct" during traffic stops)).

Once the purposes of the traffic stop are complete, an officer may not "further detain the vehicle or its occupants unless something that occurred during the traffic stop generated the necessary reasonable suspicion to justify further detention." *United States v. Torres-Ramos*, 536 F.3d 542, 550 (6th Cir. 2008) (quoting *United States v. Blair*, 524 F.3d 740, 752 (6th Cir. 2008)). Thus, in order to detain a vehicle's occupants beyond the purpose of the initial stop, an officer must have had "a reasonable and articulable suspicion that criminal activity was afoot." *Hill*, 195

F.3d at 264.  In evaluating the existence of "reasonable suspicion," courts must consider the "totality of the circumstances rather than analyze each fact in isolation." *United States v. Williams*, 615 F.3d 657, 666 (6th Cir. 2010).

Before turning to the question of reasonable suspicion, this Court must define the "proper scope and duration of the initial traffic stop." *Id.*  This Circuit explains that this involves asking, "at what point in time did the purpose of the traffic stop end and the detention of the driver and the van's occupants [] begin?" *Id.*  The answer to this question determines "*which* facts should be considered in the reasonable suspicion inquiry." *Id.* (emphasis in original).  Here, the issue of when the stop ended is complicated by the fact that Deputy Hogan never began writing a ticket to Ms. Stines.

The Government purports that Deputy Hogan "had not yet finished the purpose of the initial lawful traffic stop" at the time he began his investigatory detention of Defendant.  ECF No. 17, PageID.63.  It states that Deputy Hogan could not have completed the stop by "merely issuing a citation and allowing either the driver or passenger to drive away" since neither individual produced a license. *Id.* At the hearing, Deputy Hogan also testified that he did not view the traffic stop as complete, as he wanted to check additional information on Ms. Stines now that he discovered she was driving without a valid license.

Defendant similarly argues that the traffic stop did not conclude when Ms. Stines was placed in Deputy Hogan's patrol car. At the hearing, defense counsel reasoned that the traffic stop did not conclude until after Defendant was taken away since Deputy Hogan did not immediately issue a traffic citation to Ms. Stines.

When Deputy Hogan asked both Ms. Stines and Defendant for their licenses, Ms. Stines handed him a passport; she stated that she did not have a license because it was "probably suspended." ECF No. 17, PageID.58. Deputy Hogan then informed Ms. Stines that he was going to place her in his patrol vehicle, but he would not take her to jail. *Id.* He then handcuffed Ms. Stines and place her in the back of his patrol vehicle. *Id.* Once Ms. Stines was secure, Deputy Hogan returned to the Saturn to confirm Defendant's provided identification, which he testified was "normal procedure" for road patrol in Washtenaw County.

This Court concludes that the purposes of the traffic stop—the tinted windows and Ms. Stines' failure to use a blinker when changing lanes—was completed once Ms. Stines was placed in the patrol vehicle. Issuing a ticket to a driver does not require an officer to detain that driver in order to separately question a passenger about his identification. *See Torres-Ramos*, 536 F.3d at 551 (finding that the traffic stop ended when the officer placed the driver in his patrol car, which occurred immediately after he called for a canine unit); *see also Blair*, 524 F.3d at 752 (noting

that once the officer possessed sufficient information to write and issue a tag light violation, any subsequent actions "extended the scope and duration of the stop").

Unless Deputies Hogan and Khattar had reasonable suspicion that criminal activity was afoot at this moment, Defendant's ensuing detention violated his Fourth Amendment rights. *Torres-Ramos*, 536 F.3d at 551. This Court finds for the reasons stated below, that it was constitutionally permissible for the police to subsequently detain Defendant. The detention was not excessively intrusive, as the officers' actions here were "reasonably related in scope to circumstances justifying the initial interference." *Hill*, 195 F.3d at 264.

There are two steps for establishing reasonable suspicion under *Terry*. *See Torres-Ramos*, 536 F.3d at 551. First, there must be an "articulation of specific facts to justify the initial detention." *Id.* If the detention is proper, then the second question is whether the degree of intrusion was "reasonably related in scope to the situation at hand." *Id.* (quoting *United States v. Caruthers*, 458 F.3d 459, 464 (6th Cir. 2006)). This second question is judged by examining the "reasonableness of the officials' conduct given their suspicions and surrounding circumstances." *Id.* The government has the burden of demonstrating, by a preponderance of the evidence, the existence of reasonable suspicion to believe—based on objective and articulable facts—that the defendant was engaged in criminal activity. *Id.* at 552. "[A]n inchoate and unparticularized suspicion or hunch of criminal activity" does not

amount to reasonable suspicion. *Blair*, 524 F.3d at 750 (citing *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000)).

In the instant case, the Government argues that the deputies had reasonable suspicion to justify further detention of Defendant. ECF No. 17, PageID.65. This Court agrees. First, at the time the deputies stopped the Saturn, it was reasonable for Deputy Hogan to suspect, based on articulable facts of his initial contact, that Defendant was the parole absconder. When Deputy Hogan first approached the Saturn, he noticed the driver was a female, and therefore not the pronounced absconder. ECF No. 17, PageID.65. He did notice, though, that the passenger could have matched the description of the absconder provided over the dispatch based on his initial observation of Defendant's physical attributes—including race, gender, build, and age. Further, Deputy Hogan testified that he noticed a "bulge" at the back of Defendant's hood—which he suspected and later confirmed was long dreads—when he asked for identification from both Ms. Stines and Defendant.

Second, Deputy Hogan developed further suspicion that Defendant was the parole absconder when Defendant complied with the request to remove his hood. This action confirmed for Deputy Hogan that Defendant indeed had long dreads as described over the dispatch.

Third, the LEIN system produced a "no record" response when Deputy Hogan input the false name "Joseph Calhoun." *Id.* Deputy Hogan testified that this

finding—including a lack of information from the Michigan Secretary of State—further fueled his suspicion that Defendant was hiding his identity as the parole absconder. It was at this time he asked Investigator Hugle if he could positively identify Defendant from the Saturn's passenger side.

Defense counsel questioned why Deputy Hogan elected not to search for Defendant's photograph before the stop began. Defense counsel argued that Deputy Hogan had the time to search his patrol car's systems while he parked opposite the Tyler residence. Further, he purported that MDOC also could have produced a photograph at some point during their investigation. While this Court denotes that a photograph could have been helpful for Deputy Hogan's initial contact, such an action was not necessary to establish reasonable suspicion. Deputy Hogan ultimately relied on his personal observations before confirming Defendant's identity with Investigator Hugle.

Defendant additionally argues that it was "unlikely [the officers] would have stopped the vehicle but for the MDOC request." ECF No. 13, PageID.45. Therefore, Defendant purports, no reasonable suspicion existed to further detain Defendant. The Sixth Circuit has determined, though, that a *Terry* stop is "permissible where a crime has been completed and where the information supplying the reasonable suspicion *came from another person* rather than the officer's personal observation."

*United States v. Thomas*, 11 F.3d 620, 628 (6th Cir. 1993) (emphasis added) (citing *United States v. Barnes*, 910 F.2d 1342, 1343 (6th Cir. 1990)).

In *Thomas*, the court was satisfied that the officers had specific and articulable facts which constituted reasonable suspicion, based on an earlier police report which included information gathered from other eyewitnesses, when they stopped defendant. *Thomas*, 11 F.3d at 628. Similarly, in *Barnes*, the court determined an agent's "specific information from reliable informants concerning [Defendant] Barnes" provided the officers with reasonable suspicion to make a *Terry* stop. *Barnes*, 910 F.2d at 1342. The deputies here, like the officers in *Thomas* and *Barnes*, relied on specific information from other investigative sources—the ARU investigators—when conducting the *Terry* stop. By giving due weight to the specific and articulable facts of Defendant's recent parole violation which the deputies knew prior to the stop, this Court finds there was sufficient reasonable suspicion to stop and briefly detain Defendant for investigative purposes.

Deputy Hogan's three above-mentioned observations, together with the information provided over the dispatch, at least supports a reasonable suspicion that Defendant was the absconder and therefore further detention was warranted.

This Court must next consider whether the seizure was "reasonably related in scope to the justification for their initiation." *United States v. Davis*, 430 F.3d 345, 355 (6th Cir. 2005) (quoting *United States v. Place*, 462 U.S. 696, 706 (1983)).

"Typically, this means that an officer may ask the detainee a moderate number of questions to determine his identity and try to obtain information confirming or dispelling the officer's suspicions." *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984); *see also United States v. Noble*, 762 F.3d 509, 519 (6th Cir. 2014). Ultimately, the detention must be "'limited in [both] scope and duration.'" *United States v. Everett,* 601 F.3d 484, 488 (6th Cir. 2010) (quoting *Florida v. Royer*, 460 U.S. 491, 500 (1983)).

The "touchstone" of this analysis is the "reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security." *United States v. Lambert*, 770 Fed.Appx. 737, 739 (6th Cir. 2019) (internal citation omitted). Officers must use "the least intrusive means reasonably available to verify or dispel [their] suspicion in a short period of time[;]" the detention "must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Royer,* 460 U.S. at 500. Where a detention is found to exceed its proper scope, any items seized from a resulting unlawful search must be excluded as fruits of the poisonous tree. *United States v. Hill*, 195 F.3d 258, 264 (6th Cir. 1999) (internal citation omitted).

Officers' inquiries into matters "unrelated to the justification for the traffic stop … do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." *Everett*,

601 F.3d at 490. This Court must evaluate the reasonableness of a prolonged stop by considering the "totality of the circumstances, which requires considering both the duration of the [stop] and its subject matter." *United States v. Stepp*, 680 F.3d 651, 662 (6th Cir. 2012).

Here, the duration of the *Terry* stop was approximately three minutes.[3] During this inquiry, Deputy Hogan asked Defendant to confirm his identity, remove the hood from his sweatshirt, and hand over the Saturn's keys. Deputy Hogan then returned to his patrol car to run a LEIN search with Defendant's provided false name. ECF No. 17, PageID.59. He returned to the Saturn once Investigator Hugle positively identified him as the parole absconder. Gov.'s Ex. B 00:05:56. These facts demonstrate how the officers did not unreasonably prolong the stop.

Additionally, most of Deputy Hogan's questions were of the context-framing kind deemed reasonable in *Everett*. *See Everett*, 601 F.3d at 494 (explaining that "context-framing questions," such as motorists' travel history, plans, and authority to operate the vehicle, will rarely suggest an officer's lack of diligence). Here, Deputy Hogan only asked Defendant two questions about his identity and one question about his travel plans. These questions were related to the ongoing investigation—which, as established above, was based on reasonable suspicion.

---

[3] At the hearing, both parties agreed that the entire encounter—from the time Deputy Hogan approached the Saturn until Defendant was arrested—was under ten minutes.

There is nothing about the subject matter of these questions to suggest a lack of diligence on Deputy Hogan's part in conducting the stop.

Thus, it was constitutionally permissible to detain Defendant. The detention was not excessively intrusive, as the officers' actions were "reasonably related in scope to circumstances justifying the initial interference." *Hill*, 195 F.3d at 264.

## C. Subsequent Arrest

Defendant also argues that the officers lacked probable cause to arrest him. ECF No. 13, PageID.45. An arrest constitutes an unreasonable seizure in violation of the Fourth Amendment in the absence of probable cause. *United States v. Torres-Ramos*, 536 F.3d 542, 554 (6th Cir. 2008) (internal citation omitted). In order to determine whether an arrest was supported by probable cause, courts determine whether, at the time of the arrest, the "facts and circumstances within [the arresting officer's] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent" person to conclude than an individual had committed or was committing an offense. *Beck v. Ohio*, 379 U.S. 89, 91 (1964). This inquiry requires a court to examine the events leading up to an arrest and then to decide "whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amounted to probable cause." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003).

In support of his argument, Defendant claims that his encounter with the officers converted to an arrest when he was asked to give Deputy Hogan the keys to the Saturn. ECF No. 13, PageID.41. Defendant argues that he was not free to leave at this time, as Deputy Hogan instructed him to "sit tight" before attempting to verify his identity in the LEIN system.

The Government responds by stating that Deputy Hogan's reasonable suspicion that the passenger was in fact Defendant began building into probable cause after Defendant falsely identified himself—twice—as "Joseph Calhoun." ECF No. 17, PageID.65. Further, Deputy Hogan discovered that the false name produced "no record" in the LEIN system. *Id.* The Government claims that when Investigator Hugle made the positive identification by giving Deputy Hogan a "thumbs up" signal upon obtaining a clear view of Defendant through the passenger door, probable cause existed to formally arrest Defendant. *Id.*

These facts, together with the information provided by Deputy Hogan at the hearing, satisfy the threshold necessary to support a finding that probable cause existed for Defendant's arrest. This Court agrees with the Government that Defendant was formally arrested when he was asked to move out of the Saturn after Investigator Hugle's positive identification. Because his arrest was legal, the subsequent search incident to the arrest—which resulted in Deputy Hogan's finding of both the firearm and ammunition—was also legal.

# IV. CONCLUSION

For the reasons articulated above, this Court DENIES Defendant's Motion to Suppress Evidence [#13].

The Court further finds that the ends of justice served by granting a continuance outweigh the interest of Defendant and the public in a speedy trial. *See* 18 U.S.C. § 3161(h)(7)(A). Thus, the Court HEREBY GRANTS a continuance excluding October 31, 2019 through December 3, 2019 from the Speedy Trial Clock. Now that Defendant's Motion to Suppress is resolved, his counsel will need sufficient time to prepare for trial. Thus, without a continuance and necessary time to prepare, a miscarriage of justice will likely occur and/or will deny the Defendant the reasonable time necessary for effective preparation, taking into consideration the exercise of due diligence. *See* 18 U.S.C. § 3161(h)(7)(B)(i) and (iv).

| YOU WILL RECEIVE NO FURTHER NOTICE OF THESE DATES | |
| --- | --- |
| Witness Lists, Proposed Voir Dire, Proposed Jury Instructions and Proposed Verdict Form (submitted directly to Judge Drain's Chambers) due: | November 8, 2019 |
| Motions *in Limine* due: | November 8, 2019 |
| Final Pretrial Conference/Plea Cutoff Date: | November 19, 2019 at 2:00 p.m. |
| Trial Date: | December 3, 2019 at 9:00 a.m. |

IT IS SO ORDERED.

Dated:      October 30, 2019

s/Gershwin A. Drain
HON. GERSHWIN A. DRAIN
United States District Court Judge

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was mailed to the attorneys of record on this date, October 30, 2019, by electronic and/or ordinary mail.

s/Teresa McGovern
Case Manager